UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRANDEN E. HUBBARD,<br>  *Plaintiff*,<br><br> *vs.*<br><br>CAROLYN W. COLVIN,<br>*Commissioner of the Social Security Administration*,<br>  *Defendant*. | )<br>)<br>)<br>)<br>) Case No. 1:15-cv-00093-JMS-TAB<br>)<br>)<br>)<br>) |

### **ENTRY REVIEWING THE COMMISSIONER'S DECISION**

  Branden Hubbard applied for disability, disability insurance benefits, and supplemental security income from the Social Security Administration ("SSA") on January 27, 2012, alleging a disability onset date of May 11, 1989, which he later amended to January 27, 2012. [Filing No. 12 at 99; Filing No. 12-3 at 207.] His application was denied initially on May 10, 2012, and upon reconsideration on August 1, 2012. [Filing No. 12-2 at 21-22.] A hearing was held on November 8, 2013, before Administrative Law Judge Blanca de la Torre (the "ALJ"). [Filing No. 12-3 at 200-232.] At the hearing, Mr. Hubbard withdrew his claim for disability and disability insurance benefits so, accordingly, the ALJ only considered whether Mr. Hubbard was entitled to supplemental security income. [Filing No. 12 at 22; Filing No. 12-3 at 205-07.] The ALJ issued a decision on March 26, 2014, determining that Mr. Hubbard was not disabled and not entitled to receive supplemental security income. [Filing No. 12 at 22-37.] The Appeals Council denied review on December 23, 2014, making the ALJ's decision the Commissioner's final decision subject to judicial review. [Filing No. 12 at 9-13.] Mr. Hubbard then filed this action under 42 U.S.C. § 405(g), requesting that the Court review the Commissioner's denial. [Filing No. 1.]

1

# I.
## BACKGROUND

Mr. Hubbard was twenty-three years old when he applied for disability insurance benefits and supplemental security income with the SSA, initially alleging a disability onset date of May 11, 1989, and later changing his disability onset date to January 27, 2012. [Filing No. 12 at 89; Filing No. 12 at 99; Filing No. 12-3 at 209.] He is a high school graduate, but he has not had any past relevant work. [Filing No. 12-3 at 209; Filing No. 12-3 at 212.] At the time of his hearing in front of the ALJ, Mr. Hubbard was not employed. [Filing No. 12-3 at 210.] He suffers from various impairments, which will be discussed as necessary below.[1] The ALJ noted that Mr. Hubbard last met the insured status requirements of the Social Security Act on December 31, 2009. [Filing No. 12 at 22.]

Using the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4), the ALJ issued an opinion on March 26, 2014, determining that Mr. Hubbard was not entitled to receive supplemental security income. [Filing No. 12 at 22-37.] The ALJ found as follows:

- At Step One of the analysis, the ALJ found that Mr. Hubbard had not engaged in substantial gainful activity[2] after the alleged disability onset date. [Filing No. 12 at 24.]

---

[1] Mr. Hubbard detailed pertinent facts in his opening brief, and the Commissioner did not dispute those facts. Because those facts implicate sensitive and otherwise confidential medical information concerning Mr. Hubbard, the Court will simply incorporate those facts by reference herein. Specific facts will be articulated as needed.

[2] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a); 20 C.F.R. § 416.972(a).

- At Step Two of the analysis, the ALJ found that Mr. Hubbard suffered from the severe impairments of a "Learning Disorder and an Adjustment Disorder with Depressed Mood." [Filing No. 12 at 25.]

- At Step Three of the analysis, the ALJ found that Mr. Hubbard did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Filing No. 12 at 25-31.]

- After Step Three but before Step Four, the ALJ found that Mr. Hubbard had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels," but with the following nonexertional limitations: "He is not able to climb ladders, ropes or scaffolds, but he is able to climb ramps and stairs. He is able to understand, remember and carry out short, simple and repetitive instructions. He is able to sustain attention and concentration for two-hour periods at one time and for eight hours in the workday while performing such tasks. He has the ability to use judgment in making work-related decisions commensurate with this type of work. He requires an occupation with set routine and procedures, working with objects rather than text or numbers, and few changes during the workday. He requires an occupation with only occasional co-worker contact and supervision, and no contact with the public. He must avoid hazards such as unprotected heights and dangerous moving machinery." [Filing No. 12 at 31-35.]

- At Step Four of the analysis, the ALJ found that Mr. Hubbard had no past relevant work. [Filing No. 12 at 35.]

- At Step Five of the analysis, the ALJ found that Mr. Hubbard was capable of performing a significant number of jobs in the national economy, including Housekeeper, Laundry Worker, and Automobile Detailer. [Filing No. 12 at 35-36.]

Mr. Hubbard sought review of the ALJ's decision from the Appeals Council, but that request was denied on December 23, 2014, making the ALJ's decision the Commissioner's final decision subject to judicial review. [Filing No. 12 at 9-13.] Mr. Hubbard then filed this action, asking that the Commissioner's decision be reversed and an award of benefits made to him, or in the alternative, the case be remanded for further proceedings. [Filing No. 1.]

## II.
### STANDARD OF REVIEW

"The Social Security Act authorizes payment of disability insurance benefits and Supplemental Security Income to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214, 122 S. Ct. 1265, 152 L.Ed.2d 330 (2002). "The statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second it requires an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last . . . not less than 12 months." *Id.* at 217.

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the

ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must afford the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v), evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in original). "If a claimant satisfies steps one, two, and three, [he] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [he] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's RFC by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. §§ 416.920(e)(g). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *Clifford*, 227 F.3d at 868.

5

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (citation omitted).

### III.
#### DISCUSSION

Mr. Hubbard challenges the ALJ's decision on four grounds, arguing that: (1) substantial evidence does not support the ALJ's RFC assessment and corresponding hypothetical questions to the Vocational Expert as they did not comply with *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); (2) substantial evidence does not support the ALJ's finding that Mr. Hubbard did not meet or equal Listing 12.05C; (3) substantial evidence does not support the ALJ's RFC assessment that Mr. Hubbard's non-cognitive impairment was merely an adjustment order with a depressed mood, because the ALJ improperly concluded that Mr. Hubbard's treating physician's opinion should not be given weight; and (4) substantial evidence does not support the ALJ's finding that Mr. Hubbard could work as a housekeeper. [Filing No. 14 at 7-23.] The Court will address each argument in turn.

### A.   RFC Assessment, Questions to Vocational Expert, and Step Five Determination

Mr. Hubbard first argues that substantial evidence does not support the ALJ's RFC assessment, corresponding hypothetical questions to the Vocational Expert upon which the ALJ relied, or Step-Five decision because the ALJ did not comply with *O'Connor-Spinner* and its progeny. [Filing No. 14 at 7.] Specifically, Mr. Hubbard argues that when a claimant has

moderate difficulties maintaining concentration, persistence, or pace, such moderate difficulties should be reflected in both an ALJ's RFC assessment and the hypothetical questions posed to a vocational expert upon whose testimony the ALJ relies. [Filing No. 14 at 7.] Mr. Hubbard contends that the ALJ did not account for his recognized moderate difficulties in either his RFC or in the corresponding hypothetical questions to the Vocational Expert. [Filing No. 14 at 8-9.] In assessing Mr. Hubbard's RFC, the ALJ found that Mr. Hubbard could perform jobs with short, simple, and repetitive instructions for two-hour intervals, which Mr. Hubbard argues does not adequately account for his moderate difficulties maintaining concentration, persistence, or pace under *O'Connor-Spinner*. [Filing No. 14 at 8-9.] Finally, Mr. Hubbard argues this resulted in a harmful error as the ALJ relied on the Vocational Expert's testimony for the Step Five decision. [Filing No. 14 at 11.]

The Commissioner responds that the ALJ did indeed comply with the holding of *O'Connor-Spinner*. [Filing No. 17 at 4.] The Commissioner argues that the ALJ did not merely limit Mr. Hubbard to simple, repetitive unskilled work, but rather the ALJ's RFC assessment and hypothetical questions to the Vocational Expert specified that Mr. Hubbard could understand, remember, and carry out short, simple, and repetitive instructions, and could sustain attention for two hours at a time, and for eight hours in a workday while performing those limited tasks. [Filing No. 17 at 4.] The Commissioner continues by arguing that the ALJ acted consistently with *O'Connor-Spinner* in accommodating Mr. Hubbard by providing limitations to the types of jobs that Mr. Hubbard could perform due to his specific deficiencies. [Filing No. 17 at 5.] The Commissioner notes that "the ALJ also accommodated Plaintiff's deficiencies in concentration, persistence or pace by limiting him to occupations with set routines and procedures, that would have few changes during the work day, and that would require working with objects, rather than

7

text or numbers." [Filing No. 17 at 5.]  Finally, the Commissioner argues that the Vocational Expert was well aware of Mr. Hubbard's actual limitations based on Mr. Hubbard's own testimony, and that the Vocational Expert took this into account when identifying jobs Mr. Hubbard could perform.  [Filing No. 17 at 5-6.]

On reply, Mr. Hubbard argues that the Court should reject the Commissioner's argument that the ALJ accounted for Mr. Hubbard's reduced attention and concentration through other elements of her RFC assessment, because the ALJ found that Mr. Hubbard could perform work for two-hour intervals without any reduced attention or concentration.  [Filing No. 18 at 2.]  Mr. Hubbard also argues that the Vocational Expert's testimony that Mr. Hubbard can perform jobs based on his own testimony does not constitute substantial evidence.  [Filing No. 18 at 4.]

The Court's role in this action is limited to ensuring that "the ALJ applied the correct legal standard, and [that] substantial evidence supports the decision."  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir.2004).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).  "[C]ourts will rarely be able to say that the [ALJ's] finding was not supported by substantial evidence."  *Glenn v. Sec'y of Health & Human Services*, 814 F.2d 387, 391 (7th Cir. 1987).

### 1. The ALJ's RFC Assessment

"In most cases…employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the [vocational expert's] consideration those positions that present significant problems of concentration, persistence and pace."  *O'Connor-Spinner,* 627 F.3d at 620.  Here, the ALJ found in Mr. Hubbard's RFC assessment that, "[h]e is able to understand, remember and carry out short, simple and repetitive instructions."  [Filing No. 12 at 32.]  However, the ALJ

8

imposed additional restrictions to account for Mr. Hubbard's deficiencies in concentration, persistence, and pace, including:

> He requires an occupation with set routine and procedures, working with objects rather than text or numbers, and few changes during the work day. He requires an occupation with only occasional co-worker contact and supervision, and no contact with the public.

[Filing No. 12 at 32.]

The Court finds that these limitations adequately accounted for Mr. Hubbard's moderate deficiencies in concentration, persistence, and pace, and that including the restriction of "short, simple and repetitive instructions" – along with these other restrictions – is not a ground for remand.

### 2. *The ALJ's Hypothetical Questions to the Vocational Expert*

"[A] hypothetical question to the vocational expert must include all limitations supported by medical evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir.2004). "It is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare the applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform." *Id.* Although the hypothetical need not include every limitation if the expert had the opportunity to learn about the applicant's limitations through independent review of the medical records or questioning at the hearing, there must be "some amount of evidence in the record indicating that the vocational expert knew the extent of the applicant's limitations." *Id.* "When the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand." *Id.* at 1005.

9

It is well-established that "the ALJ should refer expressly to limitations in concentration, persistence and pace in the hypothetical in order to focus the [Vocational Expert's] attention on these limitations and assure reviewing courts that the [Vocational Expert's] testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir.2010).

Here, when posing the hypothetical questions to the Vocational Expert, the ALJ provided the Vocational Expert with the limitations imposed upon Mr. Hubbard due to his RFC. [Filing No. 12-3 at 229-30 (ALJ stating during questioning of the Vocational Expert, "Finally, the individual has the ability to understand, remember, and carry out short, simple, repetitive instructions; can sustain attention and concentration for two-hour periods at a time for eight hours in the work day on short, simple, repetitive tasks; can use judgment in making work-related decisions commensurate with that type of work. The occupation should have a set routine and procedure, few changes during the work day, only occasional coworker contact and supervision, no contact with the public").] Furthermore, the Vocational Expert was present during Mr. Hubbard's testimony and contemplated his capacities when determining possible occupations. [Filing No. 12-3 at 230-31.] While the ALJ did not include the restriction of working with objects rather than text or numbers in the hypothetical questions to the Vocational Expert, Mr. Hubbard does not specifically mention this omission or explain why it would require remand. Indeed, the occupations that the Vocational Expert found Mr. Hubbard could perform involve working with objects instead of text or numbers, so this omission was of no moment. [*See* Filing No. 12-3 at 230 (stating that Mr. Hubbard could be employed as a housekeeper, laundry worker, or automobile detailer).] The ALJ acted in accordance with case law from the Seventh Circuit Court of Appeals

when posing the hypothetical questions to the Vocational Expert and did not commit reversible harmful error.

In sum, the ALJ adequately accounted for Mr. Hubbard's moderate difficulties with concentration, persistence, and pace when she included limitations in the RFC in addition to the limitation that he can understand, remember and carry out short, simple and repetitive instructions. Imposing those additional limitations – including that he can sustain attention and concentration for two-hour periods at one time and for eight hours in the workday, that he needs a set routine and procedures, that he must work with objects rather than text or numbers, that there must be few changes during the workday, and that he must have only occasional co-worker contact and supervision and no contact with the public – complied with the Seventh Circuit's directive in *O-Connor-Spinner*. Additionally, the ALJ included most of those limitations in her hypothetical questions to the Vocational Expert, and her failure to include the limitation of working with objects rather than text or numbers was harmless because the occupations the Vocational Expert concluded Mr. Hubbard could perform do not involve text or numbers. The ALJ's RFC determination, her questioning of the Vocational Expert, and her Step-Five determination do not warrant remand.

### B. Step Three Analysis

Next, Mr. Hubbard argues that substantial evidence does not support the ALJ's determination at Step Three that Mr. Hubbard neither met nor equaled the requirements of Listing 12.05C, which is a listed impairment for intellectual disability. [Filing No. 14 at 11.] Rather, Mr. Hubbard argues that the ALJ found that Mr. Hubbard satisfied the third requirement of Listing 12.05C, did not evaluate whether Mr. Hubbard satisfied the first requirement, and used the wrong IQ score in assessing the second requirement. [Filing No. 14 at 12-16].

The Commissioner responds that in order to meet Listing 12.05C, the claimant must first satisfy the diagnostic description for intellectual disability in the introductory paragraph of the Listing, which the Commissioner contends Mr. Hubbard did not meet. [Filing No. 17 at 6-7.] The Commissioner argues that the ALJ acknowledged Mr. Hubbard had an IQ score between 60 and 70 after he turned twenty-two years old, but that the ALJ properly relied on Dr. Thomas' opinion that Mr. Hubbard's intelligence was in the low average range. [Filing No. 17 at 7.]

Mr. Hubbard replies that the Commissioner was unresponsive to Mr. Hubbard's argument that he did not satisfy the diagnostic criteria of Listing 12.05C. [Filing No. 18 at 4-5.] He also argues that Dr. Thomas should have relied upon the lowest IQ score of 67 and, because he did not, his "opinions are not substantial evidence." [Filing No. 18 at 6.]

The Code of Federal Regulations provides that the Social Security Administration "will find that [a claimant's] impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement...." 20 C.F.R. § 416.925(c)(3). The listing for intellectual disability, Listing 12.05, contains an initial paragraph which lays out the diagnostic description of intellectual disability plus four separate criteria (paragraphs A through D). *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00. In order to meet Listing 12.05, a claimant must have an impairment that meets the four requirements of that Listing. *See Adkins v. Astrue*, 226 Fed. Appx. 600, 605 (7th Cir.2007) (citing 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05); *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir.1999).

The Seventh Circuit Court of Appeals summarized the requirements for a finding of intellectual disability under Listing 12.05C as follows: "(1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning initially manifested during the developmental period before age 22; (3) a valid verbal, performance, or full scale IQ of sixty

through seventy; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Adkins*, 226 Fed. Appx. at 605 (citations omitted); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 at Section 12.00(A) ("Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing"). The Seventh Circuit has also noted that "[o]rdinarily a person with an IQ under 70 and at least one additional impairment that imposes a limitation on ability to work…is automatically deemed to be disabled." *Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014). The term "deficits in adaptive functioning," the second of the four requirements, "denotes inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir.2007) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV–TR)* 42 (4th ed. 2000)).

Relying heavily on the expert opinion of Dr. Thomas, the ALJ found that Mr. Hubbard did not establish the level of severity required for Listing 12.05C. [Filing No. 12 at 26-30.] Dr. Thomas considered Mr. Hubbard's school records, which included several IQ scores, in rendering an opinion that although Mr. Hubbard's intellectual functioning fell in the low average range, it did not reach the intellectually disabled range. [Filing No. 12-2 at 14.] Dr. Thomas acknowledged that some IQ scores were in the deficient range, but also found that some IQ scores were in the borderline average range. [Filing No. 12-2 at 14.] Dr. Thomas attributed the suppressed IQ scores to Mr. Hubbard's emotional difficulties, and concluded that his true intellectual capacity was in the low average range, rather than the significantly subaverage range. [Filing No. 12-2 at 14.]

The Commissioner argues only that the ALJ properly found Mr. Hubbard did not meet the introductory paragraph of the Listing, which requires "significantly subaverage general intellectual functioning." The Commissioner focused on the ALJ's explanation regarding why she was discounting Mr. Hubbard's IQ score of 67 in 2011. The Court finds the ALJ's discussion of Listing 12.05C inadequate. First, the ALJ did not specify that she was considering whether Mr. Hubbard satisfied the introductory paragraph of Listing 12.05C. Rather, she stated that "[t]o meet the level of severity described in Section 12.05C, there must be a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function," and then went on to discuss why she was discounting the IQ score of 67. [Filing No. 12 at 26.] The Commissioner's rationalization that the ALJ was simply considering whether Mr. Hubbard met the introductory paragraph of Listing 12.05C does not appear anywhere in the ALJ's opinion.

Second, the Court finds that the ALJ's reasons for discounting the IQ score of 67 – that the examiner in 2011 did not have access to Mr. Hubbard's school records,[3] that Mr. Hubbard had obtained a higher IQ score in 2005 when he was seventeen, and that Dr. Thomas concluded the lower scores were "suppressed due to long-term emotional difficulties" – are not sufficient. Indeed, Dr. Thomas did not conclude that the IQ score of 67 was invalid, but only made a more general statement that Mr. Hubbard's "long term emotional difficulties…also suppress some of his performance from time to time creating cognitive[] inefficiency." [Filing No. 12-2 at 14.] And Dr. Thomas also concluded that Mr. Hubbard has "a history of atypical psychotic features also

---

[3] The ALJ discounted Mr. Hubbard's IQ score of 67 in 2011 by noting that the psychological consultative examiner who administered the test "acknowledged that he did not have access to school records." [Filing No. 12 at 26.] The ALJ did not explain why that matters, or how those school records may have contradicted the IQ score of 67. The Court finds that not having access to Mr. Hubbard's school records does not have any impact on the validity of the IQ score of 67.

increasing his overall dysfunction and lower adaptation." [Filing No. 12-2 at 14.] Notably, Dr. Tanley, who administered the test, explicitly found that the IQ score of 67 "appear[ed] to be valid." [Filing No. 12-1 at 98 ("in the absence of any evidence of the contrary, these results appear to be valid").] The ALJ does not address Dr. Tanley's finding in connection with her Listing 12.05C discussion.

Additionally, the medical records indicate that Mr. Hubbard has struggled with adaptive functioning from a young age. [*See, e.g.*, Filing No. 12-1 at 49 (school social worker noting in April 2005 that Mr. Hubbard "scored significantly low in the following subscales: Home Living, Social, Community Use and Work, and both the Home Version and School Version indicated these concerns…At this time, [he] is receiving modified instruction and support in the school setting for his disabilities").] While the ALJ acknowledges some of these records, she does not explain why they are insufficient to establish that Mr. Hubbard displayed "deficits in adaptive functioning initially manifested during the developmental period before age 22," as required to meet Listing 12.05C.

Because the Court finds that the ALJ's articulated reasons for rejecting Mr. Hubbard's IQ score of 67 were not valid, and since the medical record contains evidence of deficits in adaptive functioning before the age of twenty-two, the Court concludes that remand of this action is appropriate so that the ALJ can more thoroughly consider whether Mr. Hubbard met Listing 12.05C.

### C. ALJ's Consideration of Treating Physician's Opinion

Next, Mr. Hubbard argues that the ALJ failed to take into account the opinions of two treating physicians, Dr. Sheikh and Dr. Varghese, when she assessed Mr. Hubbard's RFC and determined that Mr. Hubbard had an adjustment disorder. [Filing No. 14 at 18-20.] Mr. Hubbard

15

contends that a reasonable ALJ would have found that Mr. Hubbard was more limited than the ALJ ultimately found. [Filing No. 14 at 20.]

In response, the Commissioner argues that the ALJ did consider Dr. Sheikh's opinion, and provided several good reasons why it gave little weight to that opinion compared to Dr. Thomas' opinion. [Filing No. 17 at 10-12.] Furthermore, the Commissioner noted that Dr. Varghese's opinion, which Mr. Hubbard relied upon in his brief, is dated after the ALJ issued her decision, thus the Commissioner contends that the opinion should not be considered on appeal. [Filing No. 17 at 13.]

On reply, Mr. Hubbard argues that the Commissioner misstated Mr. Hubbard's argument, and that he argued more generally that the ALJ "did not give legally sufficient reasons for finding that [he] merely had an adjustment disorder with depressed mood instead of the more serious mental illness his treating psychiatrist diagnosed." [Filing No. 18 at 9.]

An ALJ must give a treating physician's opinion controlling weight if it is both "(1) supported by medical findings; and (2) consistent with substantial evidence in the record." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citation omitted). If the ALJ finds that the opinion is not entitled to controlling weight, the ALJ must still assess the proper weight to give to the opinion. *See id.* This involves consideration of several facts, including the "length, nature, and extent of the physician and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue." *Id.* (citations omitted). If the ALJ "discounts the physician's opinion after considering these factors," a reviewing court "must allow that decision to stand so long as the ALJ minimally articulated his reasons" for doing so. *Id.* (internal quotation marks and alteration omitted). This is a "very deferential standard," *id.*, but even so, a court must assure itself that the

16

ALJ "offer[ed] 'good reasons' for discounting [the] treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citation omitted).

Here, the ALJ clearly considered the opinion of Dr. Sheikh; however, the ALJ gave more weight to the opinion of Dr. Thomas. The ALJ gave several reasons for deferring to Dr. Thomas' opinion, rather than to Dr. Sheikh's opinion, including that Dr. Sheikh's assessment was inconsistent with the assessments of several other medical professionals and with Mr. Hubbard's testimony, and also that Dr. Sheikh's notes reflected improvement over time by Mr. Hubbard. [Filing No. 12 at 31; Filing No. 12 at 33-34.] The Seventh Circuit has made clear that an ALJ need not explicitly weigh every relevant factor to conclude that a treating physician's opinion should be discounted, as long as the ALJ otherwise articulates why it is inconsistent with the record. *See Henke v. Astrue*, 498 Fed. Appx. 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor [in 20 C.F.R. § 404.1527] while discussing her decision to reject [the treating physician's] reports, but she did note the lack of medical evidence supporting [the treating physician's] opinion…and its inconsistency with the rest of the record…This is enough"); *Clifford*, 227 F.3d at 870 (ALJ need only "minimally articulate his reasons for crediting or rejecting" a treating physician's opinion). While the ALJ provided reasons for giving more weight to the opinion of Dr. Thomas, the ALJ should ensure on remand that this conclusion is justified, and should take care to adequately explain her reasons for reaching that conclusion.

### D. Employment as a Housekeeper

Mr. Hubbard argues that the ALJ erroneously concluded that he could perform work as a housekeeper because his RFC limits him to jobs with no contact with the public, and the DOT description for a housekeeper position includes "render[ing] personal assistance to patrons." [Filing No. 14 at 21.] In response, the Commissioner acknowledges this error, but notes that it

17

does not require remand because the Vocational Expert also concluded that Mr. Hubbard could perform work as a laundry worker or automobile detailer. [Filing No. 17 at 13-14.] Mr. Hubbard asserts on reply that the error should still be corrected if the Court remands the case for other reasons.

As Mr. Hubbard acknowledges, the Vocational Expert's finding – adopted by the ALJ – that he could perform work as a housekeeper is not an independent ground for remand because the Vocational Expert also found that Mr. Hubbard could work as a laundry worker or automobile detailer. But because the Court has concluded that remand is warranted on the Listing 12.05C issue, the ALJ should correct this error on remand as well.

## IV.
### CONCLUSION

For the reasons stated herein, the Court **VACATES** the ALJ's decision denying Mr. Hubbard supplemental security income and **REMANDS** this matter for further proceedings consistent with this opinion pursuant to 42 U.S.C. § 405(g) (sentence four). Judgment shall issue accordingly.

On remand, the ALJ should reconsider whether Mr. Hubbard meets Listing 12.05C. In making that finding, the ALJ must develop a logical bridge as to why Mr. Hubbard does or does not meet the mental impairment listings. The ALJ should also reconsider whether Dr. Thomas' opinion should be given greater weight than Mr. Hubbard's treating physician's opinion, and should ensure that she adequately explains her reasons for her conclusion. Additionally, although not thoroughly raised by Mr. Hubbard, the Court instructs the ALJ to review Mr. Hubbard's RFC to the extent that it provides that he "is able to sustain attention and concentration for two-hour periods at one time and for eight hours in the workday while performing such tasks." It is unclear whether breaks after the two-hour periods are built into the RFC, and the ALJ should clarify that

18

issue and, assuming breaks are needed to account for Mr. Hubbard's difficulties with concentration, persistence, and pace, explicitly provide for breaks in the RFC and employ a vocational expert to determine Mr. Hubbard's range of work based on that clarification. The ALJ should also make sure to include every limitation in the RFC (*e.g.*, that Mr. Hubbard should work with objects rather than text or numbers) when posing hypothetical questions to the vocational expert. Finally, as noted above, the ALJ should correct the error regarding Mr. Hubbard's ability to perform work as a housekeeper.

Date: October 19, 2015

                                                     Hon. Jane Magnus-Stinson, Judge
                                                     United States District Court
                                                     Southern District of Indiana

**Distribution via ECF only to all counsel of record**